# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

DYAN M. SMITH,

               Plaintiff,

    v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

               Defendant.

Case No.  EDCV 07-0482-JTL

MEMORANDUM OPINION AND ORDER

## PROCEEDINGS

On April 23, 2007, Dyan M. Smith ("plaintiff") filed a Complaint seeking review of the Social Security Administration's denial of her application for Disability Insurance Benefits.  On April 18, 2007, Michael J. Astrue, Commissioner of Social Security ("defendant"), filed a Consent to Proceed Before United States Magistrate Judge Jennifer T. Lum.  On May 23, 2007, plaintiff filed a Consent to Proceed Before United States Magistrate Judge Jennifer T. Lum.  Thereafter, on September 10, 2007, defendant filed an Answer to the Complaint.  On January 9, 2008, the parties filed their Joint Stipulation.

The matter is now ready for decision.

///

///

**BACKGROUND**

On January 14, 2002, plaintiff filed an application for Disability Insurance Benefits. (Administrative Record ["AR"] at 58-61). On June 12, 2002, the Commissioner denied plaintiff's application for benefits. (AR at 50-54). Thereafter, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR at 55).

On January 27, 2003, the ALJ conducted a hearing in San Bernardino, California. (See AR at 29-49). Plaintiff appeared at the hearing with counsel and testified. (AR at 31-48). On February 25, 2003, the ALJ issued his decision denying benefits to plaintiff. (AR at 12-18). The ALJ concluded that plaintiff suffered from a questionably severe impairment in the musculoskeletal system that did not meet or equal any of the criteria contained in the Commissioner's Listing of Impairments, 20 C.F.R. Section 404, Subpart P, Appendix 1, and that plaintiff did not suffer from a severe mental impairment. (AR at 13, 16, 17). The ALJ concluded that plaintiff retained the residual functional capacity to perform her past relevant work as a loan processor, escrow assistant, sales associate and loan funder, and that she was, therefore, not disabled. (AR at 15, 17). The Appeals Council denied plaintiff's timely request for review of the ALJ's decision. (AR at 4-5).

Thereafter, plaintiff appealed to the United States District Court. On January 25, 2005, the Court ordered the matter remanded and instructed the ALJ to properly evaluate all of the evidence regarding plaintiff's alleged severe mental impairment including plaintiff's testimony and the opinions rendered by Lita S. Hedglin, M.D., Nadar Oskooilar, M.D., and Mark Salib, M.D. (AR at 264-69).

On September 8, 2005, the ALJ conducted a second hearing in San Bernardino, California. (See AR at 392-417). Plaintiff appeared at the hearing with counsel and testified. (AR at 394-406). Plaintiff's sister, Susan Hart, also appeared at the hearing and testified. (AR at 407-11). In addition, Joseph Mooney, a vocational expert, appeared and testified at the hearing. (AR at 411-15).

On January 6, 2006, the ALJ issued his second decision denying benefits to plaintiff. (AR at 246-51). The ALJ found that while plaintiff had a "questionable severe impairment in the

muscuoskeletal system and a severe mental impairment," she retained the capacity to perform the full range of medium work with limited mental limitations and was, therefore, not disabled. (AR at 250-51). The Appeals Council denied plaintiff's timely request for review of the ALJ's decision. (AR at 220-22).

Thereafter, plaintiff appealed to the United States District Court.

## PLAINTIFF'S CONTENTIONS

Plaintiff makes the following claims:

1.     The ALJ failed to properly consider the opinion of Harvey Price, M.D., plaintiff's treating physician, regarding plaintiff's physical residual functional capacity.

2.     The ALJ failed to properly consider the opinion of Nader Oskooilar, M.D., a consultative psychiatric examiner, regarding plaintiff's residual functional capacity.

3.     The ALJ failed to properly consider the opinion of Michael Drennan, M.D., plaintiff's treating psychiatrist, regarding plaintiff's mental residual functional capacity.

4.     The ALJ improperly relied upon the opinion of William Cable, M.D., a non-examining medical advisor, in support of his findings regarding plaintiff's mental residual functional capacity.

5.     The ALJ failed to properly credit plaintiff's testimony regarding her subjective complaints.

6.     The ALJ failed to properly credit the lay witness testimony of Susan Hart, plaintiff's sister.

## STANDARD OF REVIEW

Under 42 U.S.C. Section 405(g), this Court reviews the ALJ's decision to determine whether the ALJ's findings are supported by substantial evidence and whether the proper legal standards were applied. DeLorme v. Sullivan, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence means "more than a mere scintilla" but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Saelee v. Chater, 94 F.3d 520, 521-22 (9th Cir. 1996).

3

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401. This Court must review the record as a whole and consider adverse as well as supporting evidence. Morgan v. Comm'r, 169 F.3d 595, 599 (9th Cir. 1999). Where evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006).

## DISCUSSION

### A.      The Sequential Evaluation

A claimant is disabled under Title II of the Social Security Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or . . . can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920.

The first step is to determine whether the claimant is presently engaging in substantially gainful activity. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). If the claimant is engaging in substantially gainful activity, disability benefits will be denied. Bowen v. Yuckert, 482 U.S. 137, 141 (1987). Second, the ALJ must determine whether the claimant has a severe impairment. Parra, 481 F.3d at 746. Third, the ALJ must determine whether the impairment is listed, or equivalent to an impairment listed, in Appendix I of the regulations. Id. If the impediment meets or equals one of the listed impairments, the claimant is presumptively disabled. Bowen, 482 U.S. at 141. Fourth, the ALJ must determine whether the impairment prevents the claimant from doing past relevant work. Parra, 481 F.3d at 746. If the claimant cannot perform his or her past relevant work, the ALJ proceeds to the fifth step and must determine whether the impairment prevents the claimant from performing any other substantially gainful activity. Id.

///

The claimant bears the burden of proving steps one through four, consistent with the general rule that at all times, the burden is on the claimant to establish his or her entitlement to disability insurance benefits. Id. Once this prima facie case is established by the claimant, the burden shifts to the Commissioner to show that the claimant may perform other gainful activity. Lounsburry v. Barnhart, 468 F.3d 1111, 1114 (9th Cir. 2006).

**B.    Harvey Price, M.D.**

Plaintiff argues that the ALJ improperly disregarded the opinion of Harvey Price, M.D., plaintiff's treating physician, when determining plaintiff's physical residual functional capacity. The record contains documentation of the treatment plaintiff received from Dr. Price from April to December 2001. In a letter dated January 9, 2002 to Charles E. Binder, plaintiff's counsel, Dr. Price summarized his treatment of plaintiff:

> [Plaintiff] came originally to me with complaints of chronic pain and continued high blood pressure, difficult to control. [AR at 120]. She complained of being chronically fatigued and having difficulty sleeping because she was able to get to sleep but then would wake up in an hour or two uncomfortable and painful and have to move around [quite] a bit and then take about a half hour to get back to sleep. She also complained of painful knees when initially seen and these have become worse. [AR at 120, 117, 115]. She also has Raynaud's Syndrome and her fingers and toes get bone white and numb when she gets cold.

(AR at 122). In addition, Dr. Price noted that plaintiff was diagnosed with chronic fatigue syndrome at the age of 34 and that her maternal grandmother, mother and sister all have fibromyalgia. (AR at 122). Dr. Price referred to plaintiff's consultation with Dr. Gandler, a rheumatologist in Oregon, who examined plaintiff and concluded that she had fibromyalgia, and probably had arthritis of the knees and neck and primary Raynaud's syndrome. (AR at 123, see AR at 112).

Regarding plaintiff's physical functional capacity, Dr. Price noted that plaintiff "complain[s] of fatigue almost immediately when she tries to do anything . . . [and] finds that she has a great deal of difficulty actually working enough hours to become able to do a full time job." (AR at 122).  He found her skin tender "all along the back with no specific areas more tender than others.  It was tender over the skin of the entire neck and into the buttocks.  The feet and knees were not tender."  (AR at 123).  Dr. Price noted that plaintiff's subsequent lab work up was essentially normal and showed no signs of inflammatory arthritis or other inflammatory disease. (Id.).  Dr. Price's treatment notes indicate that he ordered x-rays of both of plaintiff's knees and that on October 18, 2001, Sid Green, M.D., sent Dr. Price the results of the x-rays and found "no evidence of joint effusion, fracture or other significant osseous abnormality" in either knee.  (AR at 121).

Dr. Price completed a Multiple Impairments Questionnaire for plaintiff dated November 9, 2002.  (AR at 125-132).  Dr. Price indicated that he had diagnosed plaintiff with fibromyalgia and "painful knees and neck" with a prognosis of "stable to progressive decline."  (AR at 125).  When asked to identify the laboratory and diagnostic test results that supported his diagnosis, Dr. Price responded "[n]one."  (AR at 126).  He classified plaintiff's level of pain as a seven on a scale of ten, which is defined as moderately severe.  (AR at 127).  He classified plaintiff's level of fatigue as eight and nine on a scale of ten, which are defined as moderately severe and severe.  (Id.).  Dr. Price noted that he had not been able to completely relieve plaintiff's pain with medication.  (Id.).

Dr. Price opined that in a normal competitive five day a week work environment on a sustained basis, plaintiff could sit for one to two hours and stand or walk for one to two hours in an eight-hour day. (AR at 127).  Dr. Price opined that plaintiff could not sit continuously in a work setting and would have to get up and move around for about five minutes every 30 minutes before she could sit again. (AR at 127-28).  Dr. Price opined that plaintiff could not stand or walk continuously in a work setting and that she would need to take many unscheduled breaks to rest at unpredictable intervals during an eight-hour workday.  (AR at 128, 130).

Dr. Price opined that plaintiff's symptoms were likely to increase if she were placed in

a competitive work environment.  (AR at 129).  He opined that plaintiff constantly experienced pain, fatigue or other symptoms severe enough to interfere with her attention and concentration. (AR at 130).  He opined that plaintiff could tolerate low work stress.  (Id.).  Dr Price indicated that plaintiff's impairments were ongoing and that he expected that they would last at least twelve months.  (Id.).

Dr. Price opined that plaintiff could occasionally lift and carry zero to ten pounds. (AR at 128).  Dr. Price stated that plaintiff has significant limitations in repetitive reaching, handling, fingering or lifting because she experienced an increase in pain with repetitive motions.  (Id.). He opined that plaintiff had marked, or essentially precluded, limitations in a number of upper body manipulations with both her right and left side.  (AR at 128-29).  In addition, Dr. Price opined that plaintiff had a number of environmental limitations and needed to avoid wetness, temperature extremes, humidity and heights, in addition to limitations precluding her from pushing, pulling, kneeling, bending, and stooping.  (AR at 131).

In his January 6, 2006 decision, the ALJ found that plaintiff retained the residual functional capacity for at least the full range of medium work.  Specifically, the ALJ opined:

> [Plaintiff] can lift and carry 50 pounds occasionally and 25
> pounds frequently.  Out of an 8-hour period, she can sit, stand,
> and/or walk for 6 hours each.  Mentally she can perform
> routine, repetitive, entry level, minimally stress work that,
> required no contact with the general public and only superficial
> interpersonal contact with co-workers and supervisors.

(AR at 250).

The ALJ adopted the physical residual functional capacity assessed by Sahniah Sicizrz-Lambert, M.D., an internal consultative examiner, and M. Jabat, M.D., a reviewing state agency physician.  (AR at 246; see AR at 139-43, 144-51).  The ALJ noted that plaintiff was "under minimal to nonexistent care for her physical complaints" and cited to the fact that plaintiff had not been to the County clinic, where she was seen for her physical complaints, in nine months. (AR at 247; see AR at 401).  The ALJ noted that the treating source records reflected physical

examinations within normal limits, that a December 2003 work up done after plaintiff was seen in the emergency room for chest pain was unremarkable, and that she was discharged in stable condition after an April 7, 2005 emergency room examination for chest pain.  (AR at 247; see AR at 356-58, 378-79).

Plaintiff argues that the ALJ failed to properly consider Dr. Price's opinion regarding plaintiff's physical residual functional capacity.  Specifically, plaintiff argues that the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Price's findings that plaintiff suffered from pain in her legs and knees consistent with fibromyalgia, arthritis of the knees and neck and Raynaud's syndrome.  (Joint Stipulation at 20).  Defendant argues that the ALJ cited to substantial evidence in support of his conclusion that plaintiff could perform medium level work and provided specific and legitimate reasons for discounting Dr. Price's opinion.  (Joint Stipulation at 22, 24-25).

The medical opinion of a treating physician is entitled to special weight.  20 C.F.R. § 404.1527; Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995) (the opinions of treating physicians should be given more weight than the opinions of doctors who do not treat the claimant).  If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it will be given controlling weight.  20 C.F.R. § 404.1527.  A finding that a treating physician's opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is not inconsistent with the other substantial evidence in the record, only means that the opinion is not entitled to controlling weight.  Social Security Ruling ("SSR")[1] 96-2p ("A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected.").  The opinions rendered by treating physicians are still entitled to deference and must be

---

[1]  Social Security Rulings are issued by the Commissioner to clarify the Commissioner's regulations and policies.  Bunnell v. Sullivan, 947 F.2d 341, 346 n.3 (9th Cir. 1991).  Although they do not have the force of law, they are nevertheless given deference "unless they are plainly erroneous or inconsistent with the Act or regulations."  Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989).

weighed using all of the factors provided in 20 C.F.R. Section 404.1527, such as the length of the treatment relationship, frequency of examination, and the nature and extent of the treatment relationship.  SSR 96-2p; 20 C.F.R. § 404.1527(d)(2).

An ALJ may properly reject the opinion of an uncontroverted treating physician only for "clear and convincing" reasons supported by substantial evidence in the record.  Lester, 81 F.3d at 830.  An ALJ may properly disregard the controverted opinion of a treating physician only by setting forth specific and legitimate reasons for doing so that are supported by substantial evidence in the record.  Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003).

Here, the ALJ properly explained his interpretation of the evidence and his decision to give little weight to the opinion of Dr. Price.  See Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988).  In his February 25, 2003 opinion,[2] the ALJ acknowledged Dr. Price's January 9, 2002 letter and his opinion regarding plaintiff's functional limitations.  (AR at 14).  The ALJ noted, however, that the diagnoses of fibromyalgia and painful knees and back due to osteoarthritis were unsupported by clinical evidence, including Dr. Price's own treatment records.  (Id.).  The ALJ noted that although Dr. Price diagnosed plaintiff with internal derangement of the right knee, the October 18, 2001 x-rays of both of plaintiff's knees were entirely within normal limits.  (AR at 14; see AR at 121).  The ALJ also noted that Dr. Price's January 9, 2002 letter described plaintiff's complaints, but then documented completely normal physical examinations, and Dr. Price stated that "[plaintiff] had shown no abnormal laboratory results relating to an inflammatory arthritis or other inflammatory disease. [AR at 123]."  (AR at 14; see AR at 122-24).  Ultimately, the ALJ properly discredited Dr. Price's functional capacity assessment because it was unsupported by clinical evidence and inconsistent with the evidence in the record, including Dr. Price's own clinical findings.  See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 1991) (ALJ properly rejected a treating physician's opinion because it was unsupported by rationale or treatment notes and offered no objective medical findings to support the plaintiff's alleged conditions); see also Baston v. Comm'r, 359 F.3d 1190,

---

[2]  The ALJ incorporated his prior decision, dated February 25, 2003, into his decision dated January 6, 2006, which is the basis of the instant appeal.  (See AR at 246).

1   1195 (9th Cir. 2003) (affirming ALJ's rejection of contradicted medical opinion because it was

2   conclusory, in checklist form and not supported by objective evidence).

3        Moreover, the ALJ's physical residual capacity findings are supported by substantial

4   evidence in the record.  The ALJ properly relied on the assessment of Dr. Siciarz-Lambert and

5   Dr. Jabat.  (AR at 246).  In a report dated April 15, 2002, Dr. Siciarz-Lambert summarized the

6   Internal Medicine Evaluation he performed at the request of the Department of Social Services.

7   (AR at 139-43).  Dr. Siciarz-Lambert noted that plaintiff's chief complaint was fibromyalgia and

8   that plaintiff reported a diagnosis of fibromyalgia in November 2001 by a rheumatologist in

9   Oregon [Dr. Gander] that was not confirmed at her current clinic in California.  (AR at 139).

10   Plaintiff stated that she was not on any medications, was told to exercise as much as she could

11   tolerate, and reported that she could walk up to one mile.  (Id.).  Dr. Siciarz-Lambert found

12   plaintiff to be a well-developed, well-nourished female with normal and graceful movements.

13   (AR at 140).  He noted that plaintiff did not use an assistive device for ambulation, was able to

14   sit comfortably without shifting in the chair, and was able to stand up from a sitting position and

15   sit up from the supine position without difficulty.  (Id.).

16        Dr. Siciarz-Lambert tested plaintiff both directly and discretely for the fibromyalgia tender

17   points and found:

18           Discretely, [plaintiff] does not complain of any areas of

19           tenderness.  Under direct examination, most of the 18 tender

20           points palpated are graded as severe pain (3), and in the back

21           region are graded at 2, moderate.  There are three controls,

22           also graded as 3, severe.

23   (Id.).  Dr. Siciarz-Lambert found no evidence of musculoskeletal deformity or swelling of any

24   joints and determined that plaintiff's range of motion was within normal limits for the upper and

25   lower extremities, with the exception of squatting, which she refused to do citing pain in her

26   right knee.  (AR at 141).  He noted that the range of motion of her back was within normal limits

27   and that palpitations along the paravertebral area did not elicit complaints of pain.  (Id.).  Based

28   on his physical examination of plaintiff and considering the possible diagnosis of fibromyalgia,

Dr. Siciarz-Lambert opined plaintiff "should be limited to pushing, pulling, lifting, and carrying 50 pounds occasionally and 25 pounds frequently" and had no other applicable restrictions at the time.  (AR at 143).

On April 26, 2002, Dr. Jabat completed a consultative request form.  Dr. Jabat stated::

> [Plaintiff's] statements about inability to function cannot be considered fully credible.  Her physical examination did not reveal significant objective findings. Her gait is normal. Motor, sensory and reflexes are all [within normal limits.] Her blood pressure is under good control.  X-rays of her knees are normal.  Her labs were normal . . . Dr. Harvey Price['s] [functional capacity findings] show that the degree of limitations given exceeds the objective findings.

(AR at 156-57).  In his April 30, 2002 physical residual functional capacity assessment of plaintiff, Dr. Jabat opined that plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently.  (AR at 145).  He indicated plaintiff could stand and/or walk for a total of six hours in an eight-hour workday with normal breaks, and sit for a total of six hours in an eight-hour workday with normal breaks.  (Id.).  Dr. Jabat indicated that plaintiff had no established postural, manipulative, visual, communicative or environmental limitations.  (AR at 146-48).

The ALJ properly relied on the opinions of Dr. Siciarz-Lambert and Dr. Jabat in making findings regarding plaintiff's physical residual functional capacity.  See Tonapetyan, 242 F.3d at 1149 (consultative examiner's opinion may constitute substantial evidence when based on independent clinical findings); Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  Thus, the ALJ's conclusion that Dr. Price's opinion was unsupported by clinical evidence and inconsistent with the evidence in the record, including Dr. Price's own clinical findings, constituted specific and legitimate reasons for rejecting Dr. Price's opinion.  See Andrews, 53 F.3d 1035 at 1041; Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989) (The ALJ is responsible for determining credibility and resolving conflicts in medical testimony).

**C.     Nader Oskooilar, M.D.**

1    Plaintiff argues that the ALJ failed to provide specific and legitimate reasons for rejecting

2    the opinion of Nader Oskooilar, M.D., an examining physician who opined that plaintiff needed

3    a break every two hours during an eight-hour workday.  (Joint Stipulation at 26-27).  Defendant

4    argues that Dr. Oskooilar's opinion regarding plaintiff's need for a break every two hours is not

5    inconsistent with the ALJ's residual functional capacity findings and that the ALJ committed no

6    error in his evaluation of Dr. Oskooilar's opinion.  (Joint Stipulation at 28-29).

7    In a letter dated April 20, 2002, Dr. Oskooilar summarized the findings of the psychiatric

8    evaluation he performed on plaintiff at the request of the Department of Social Services.  (AR

9    at 152-55).  Dr. Oskooilar opined that plaintiff was able to perform simple, low stress and

10   repetitive tasks, accept instructions and interact with a limited number of coworkers, and

11   complete a normal workday with breaks every two hours without much interruption from her

12   psychiatric condition.  (AR at 154).

13   In assessing plaintiff's mental residual functional capacity, the ALJ gave weight to the

14   opinion rendered by Romualdo Rodriguez, M.D., a consultative examiner who examined plaintiff

15   in August 2005.  (AR at 247; see AR at 290-97).  In his decision, the ALJ summarized Dr.

16   Rodriguez's findings.  The ALJ noted that Dr. Rodriguez found plaintiff "coherent and organized

17   with no loosening of associations," and that her "thought content was relevant and

18   nondelusional."  (AR at 247).  Dr. Rodriguez found plaintiff's memory and concentration intact

19   and that she was able to follow conversation with the examiner, concluded that her complaints

20   were mostly subjective, and diagnosed her with a dysthymic disorder.  (Id.).  He opined:

21   [Plaintiff] would be able to carry out simple as well as detailed,

22   complex tasks.  She would be slightly limited in her ability to

23   interact with supervisors, co-workers , and the public; maintain

24   concentration, attention, persistence and pace; adapt to

25   stresses in the normal work environment; and perform work

26   activities without special or additional supervision.

27   (Id.).

28   The ALJ also discussed the opinion of William Cable, M.D., a medical expert who

reviewed plaintiff's medical record in September 2005.  (AR at 249; see AR at 388-89).  The ALJ noted that Dr. Cable "was of the opinion that [plaintiff] did not have a severe mental impairment . . . [and] that based on the medical records [plaintiff] could perform routine, repetitive entry level, minimally stress work that required no contact with the general public and only superficial interpersonal contact with co-workers and supervisors." (AR at 249; see AR at 388).  Significantly, the ALJ noted that "Dr. Cable concluded that there was no physical or mental basis why [plaintiff] could not return to work as an escrow officer, or any other occupation of her choosing." (AR at 249; see AR at 389).

The ALJ then concluded, in an effort to "give [plaintiff] the benefit of the doubt," that plaintiff had a severe major depressive order, and that plaintiff was left with the mental residual functional capacity for routine and repetitive, entry level, minimally stressful work, requiring no contact with the general public and only superficial interpersonal contact with co-workers and supervisors.  (AR at 249).

While the ALJ did not include or discuss Dr. Oskooilar's opinion that plaintiff needed a break every two hours, such an omission does not amount to reversible error.  It is generally understood, and in some states legislated, that most regular-shift workers have a break in the morning, for lunch, and in the afternoon, which would amount to a break every two hours in an eight-hour workday.  For example, in California, the Industrial Welfare Commission Order 4-2001 requires employers to permit all persons employed in professional, technical, clerical, mechanical and similar occupations (with limited exception) to take a rest period that must, insofar as practicable, be taken in the middle of each four-hour work period, or major fraction thereof.[3]  In other words, it requires employees to take a break every two hours.

---

[3]  Section 12(A) states in relevant part:

> Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period.  The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof.

Industrial Welfare Commission Order No. 4-2001 Regulating Wages, Hours and Working Conditions in

Dr. Oskooilar did not indicate that plaintiff needed to take special breaks beyond the breaks regular workers usually receive and plaintiff has not shown that the ALJ's conclusion is inconsistent with Dr. Oskooilar's opinion.  The ALJ properly relied on the opinions of Drs. Rodriguez, Cable, Oskooilar and Salib when evaluating plaintiff's mental residual functional capacity.  Any error that may have occurred due to the ALJ's failure to specifically discuss Dr. Oskooilar's opinion that plaintiff requires a break every two hours is harmless and, thus, cannot serve as the basis for remand.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (a decision of the ALJ will not be reversed for errors that are harmless); see also Robbins, 466 F.3d at 882 (where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld).

**D.     Michael Drennan, M.D.**

Plaintiff argues that the ALJ failed to provide specific and legitimate reasons for rejecting the opinion of Michael Drennan, M.D., a psychiatrist with the Riverside County Mental Health Department, who treated plaintiff from 2001 to 2005.  (Joint Stipulation at 29-31).  Defendant argues that the ALJ gave specific and legitimate reasons for rejecting Dr. Drennan's opinion and properly relied on the opinions of Drs. Rodriguez, Cable, Oskooilar and Salib in determining plaintiff's mental limitations.  (Joint Stipulation at 32-34).

In a psychiatric/psychological Impairment Questionnaire dated August 29, 2005, Dr. Drennan diagnosed plaintiff with depressive disorder and recurrent, chronic dysthymia.  (AR at 330).  Dr. Drennan's prognosis for plaintiff was that she "[a]ppears chronically depressed." (AR at 330).  When asked to identify from a list the positive clinical findings in support of his diagnosis, Dr. Drennan marked sleep disturbance, mood disturbance, anhedonia or pervasive loss of interest, psychomotor agitation or retardation, difficulty thinking or concentrating, decreased energy, generalized persistent anxiety, and pathological dependence or passivity. (AR at 331).  When asked to identify laboratory and diagnostic test results to support his diagnosis, Dr. Drennan replied, "[n]one." (Id.).  Dr. Drennan stated that plaintiff's primary

the Professional, Technical, Clerical, Mechanical and Similar Occupations.

symptoms were: depressed mood, anxiety, profound loss of energy, and issues with her concentration and sleep. (AR at 332). He identified plaintiff's loss of energy and depressed mood as her most frequent and/or severe symptoms. (Id.).

Dr. Drennan indicated that plaintiff was markedly limited in her ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; sustain ordinary routine without supervision; and complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest breaks. (AR at 333-34). Dr. Drennan also indicated that plaintiff was moderately and mildly limited in a number of areas.[4] Dr. Drennan expected plaintiff's impairments to last at least twelve months and indicated that plaintiff was not a malingerer. (Id.). Dr. Drennan opined that plaintiff could tolerate a low degree of work stress and that her impairments were likely to produce "good days" and "bad days." (AR at 336). He estimated that, on average, plaintiff would likely be absent from work more than three times a month as a result of her impairments or treatment. (AR at 337).

The ALJ is charged with determining a claimant's residual functional capacity based on an evaluation of the evidence as a whole. See 20 C.F.R. § 416.945. As discussed above, the medical opinion of a treating physician is entitled to special weight. 20 C.F.R. § 404.1527; Reddick, 157 F.3d at 725; Lester, 81 F.3d at 830. The ALJ may reject a controverted opinion

---

[4] Dr. Drennan indicated that plaintiff was moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently. (AR at 333-35).

Dr. Drennan indicated that plaintiff was mildly limited in her ability to remember locations and work-like procedures; to understand and remember one or two step instructions; carry out simple one or two step instructions; make simple work related decisions; ask simple questions or request assistance; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (AR at 333-34).

of a treating physician's opinion by providing specific and legitimate reasons supported by substantial evidence in the record.  See Connett, 340 F.3d at 874.

The ALJ can meet this burden by setting out a "detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Cotton v. Bowen, 799 F.2d 1403, 1408 (9th Cir. 1986).  An ALJ may rely on the absence of objective findings to reject a treating physician's opinion.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995) (inadequate clinical findings provide specific and legitimate basis for ALJ to reject treating physician's opinion); Buckhart v.Bowen, 856 F.2d 1335, 1339 (9th Cir. 1988) (proper to disregard uncontroverted treating physician's opinion when he fails to provide objective descriptions of medical findings).  An ALJ may reject all or part of an examining physician's report if it contains inconsistencies, is conclusory, or inadequately supported by clinical findings.  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002).  Where the record supports an ALJ's rejection of the claimant's credibility as to subjective complaints, the ALJ is free to disregard a doctor's opinion that was premised upon the claimant's subjective complaints.  Tonapetyan, 242 F.3d at 1149-50 (ALJ properly rejected an examining physician's opinion because he relied only on claimant's subjective complaints and on testing within the claimant's control).

In his January 6, 2006 decision, the ALJ discussed in detail Dr. Drennan's treatment notes: the ALJ noted that in a treatment note dated October 2, 2004, Dr. Drennan stated that plaintiff was "venting her frustration"; on November 18, 2004, plaintiff complained of a dysfunctional family with a hypochondriacal mother and bipolar sister, and Dr. Drennan stated that while there were no blood tests to show whether plaintiff was taking her prescribed medications, her compliance was noted as good by report; the treatment note dated December 16, 2004 indicated that plaintiff's mother abused alcohol and that her sister had been over medicating herself, and the ALJ opined that plaintiff's mental problems had a huge situational/environmental component; on April 15, 2004, the notes reflected that plaintiff was mentally clear after a mental status examination, plaintiff denied significant benefits from any medication provided by Dr. Drennan, and Dr. Drennan noted that plaintiff had never had any

1   mental health hospitalizations; and on July 21, 2005, the treatment notes indicated that plaintiff

2   was "alert, without suicidal ideation, fully oriented and without psychotic process." (AR at 248).

3   The ALJ also noted that while plaintiff asserted that she was depressed and was not improving,

4   Dr. Drennan determined that it was not necessary to see her for two months. (Id.). The ALJ

5   ultimately concluded that Dr. Drennan's records "[did] not contain any personal, clinically

6   observed signs of depression," and, thus, his conclusions must have been based on plaintiff's

7   subjective complaints. (Id.).

8          The ALJ then set forth his reasons for giving Dr. Drennan's opinion little weight. The ALJ

9   discussed the lack of medical support for Dr. Drennan's assessment of plaintiff's mental

10  functions and noted that Dr. Drennan's assessment of plaintiff's mental functions was

11  unsupported by the treatment records and the minimal nature of Dr. Drennan's treatment. (Id.).

12  The ALJ noted that Dr. Drennan's treatment of plaintiff occurred during 30-minute sessions at

13  six week intervals.  The ALJ determined that Dr. Drennan's opinion that plaintiff had markedly

14  limited functions in sustained concentration and persistence, as well as a number of moderately

15  limited functions, was inconsistent with the Global Assessment of Functioning ("GAF") of 55,[5]

16  which Dr. Drennan assessed as to plaintiff on April 21, 2005.  (AR at 248; see AR at 350).  In

17  rejecting Dr. Drennan's opinion, the ALJ also concluded that Dr. Drennan's records did not

18  contain any personal, clinically observed signs of depression, but only "a parroting" of the

19  claimant's subjective complaints. (AR at 248).  A review of Dr. Drennan's treating notes shows

20  that more than a scintilla of evidence supports the ALJ's findings.

21         Finally, the ALJ noted that Dr. Drennan's opinion was inconsistent with the functional

22  limitations assessed by the State Agency Board psychiatrists.  (AR at 247-48; see AR at 168).

23  As discussed above, the ALJ relied on the opinion of Dr. Rodriguez, who examined plaintiff on

24  August 4, 2005, approximately two weeks before Dr. Drennan prepared his responses to an

25

26         [5]  "A GAF score is a rough estimate of an individual's psychological, social, and occupational
    functioning used to reflect the individual's need for treatment."  Vargas v. Lambert, 159 F.3d 1161,
27  1164 n.2 (9th Cir. 1998).  A GAF score between 51 to 60 indicates "[m]oderate symptoms (e.g., flat
    affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social,
28  occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
    Diagnostic and Statistical Manual of Mental Disorders 34 (4th. ed, rev. 2000).

Impairment Questionnaire.  Dr. Rodriguez reported that plaintiff was able to understand, remember, and carry out simple one or two-step job instructions; follow detailed and complex instructions; was slightly limited in her ability to relate to and interact with supervisors, coworkers, and the public; was slightly limited in her ability to maintain concentration and attention, persistence, and pace; was slightly limited in her ability to associate with day-to-day work activity; was slightly limited in her ability to adapt to the stresses common to a normal work environment; was slightly limited in her ability to maintain regular attendance in the work place and perform work activities on a consistent basis; and was slightly limited in her ability to perform work activities without special or additional supervision.  (See AR at 247, 290-97).  The ALJ also relied on the opinions of Drs. Cable, Oskooilar and Salib.  Although Dr. Drennan's opinion was inconsistent with the other doctors' opinions, the ALJ properly resolved the conflict and provided specific and legitimate reasons for discrediting Dr. Drennan's opinion.  See Baston, 359 F.3d at 1195 ("When presented with conflicting medical opinions, the ALJ must determine credibility and resolve the conflict.").

Finally, the ALJ noted that Dr. Drennan's opinion was inconsistent with plaintiff's activities of daily living.  (AR at 247, 248-49).  The ALJ discussed plaintiff's report of her daily activities as reported to Dr. Rodriguez, which included some cooking, chores, and yard work, and sometimes driving an automobile.  (AR at 247).  Plaintiff, however, "denied any significant activity other than watching television and sleeping." (Id.).  Based on the foregoing, substantial evidence supported the ALJ's conclusion that Dr. Drennan's opinion was unsupported.  The ALJ provided specific and legitimate reasons for rejecting Dr. Drennan's opinion and, thus, did not err in his treatment of Dr. Drennan's opinion.  See Tonapetyan, 242 F.3d at 1149-50 ("Although the contrary opinion of a non-examining medical expert does not alone constitute a specific and legitimate reason for rejecting a treating or examining physician's opinion, it may constitute substantial evidence when it is consistent with other independent evidence in the record.").

///

///

**E.   William Cable, M.D.**

Plaintiff argues that the ALJ's reliance on the opinion of William Cable, M.D., a non-examining medical advisor, is insufficient to form the basis for the ALJ's findings regarding plaintiff's mental residual functional capacity.  (Joint Stipulation at 34-36).  Defendant argues that the ALJ's findings are supported by substantial evidence, specifically, the opinions of two consultative examiners, Dr. Oskooilar and Dr. Rodriguez, and the opinions of two reviewing physicians, Dr. Salib and Dr. Cable.  (Joint Stipulation at 36).

The opinion of a reviewing physician, such as Dr. Cable, is entitled to weight.  20 C.F.R. § 404.1527(f)(2)(I) (state agency medical and psychological consultants are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation and administrative law judges must consider their findings as opinion evidence).  The ALJ noted that Dr. Cable "was of the opinion that [plaintiff] did not have a severe mental impairment . . . [and] that based on the medical records [plaintiff] could perform routine, repetitive entry level, minimally stress work that required no contact with the general public and only superficial interpersonal contact with co-workers and supervisors."  (AR at 249; see AR at 388).  Significantly, the ALJ noted that "Dr. Cable concluded that there was no physical or mental basis why she could not return to work as an escrow officer, or any other occupation of her choosing."  (AR at 249; see AR at 389).

Dr. Cable's opinion of plaintiff's mental residual functional capacity was not, as alleged by plaintiff, the sole basis of the ALJ's disability determination.  The ALJ properly credited the opinion of Dr. Cable, and also gave weight to the opinion of Dr. Rodriguez, who examined plaintiff in August 2005 and reported only "slightly limited" functional assessments, as well as Drs. Oskooilar and Salib.  (See AR at 247, 290-97).  The ALJ's decision is based on substantial evidence and he did not err in crediting Dr. Cable's opinion.

**F.   Plaintiff's Subjective Complaints**

Plaintiff argues that the ALJ improperly rejected plaintiff's subjective complaints regarding her functional limitations.  (Joint Stipulation at 37-38).  At the September 8, 2005 hearing, plaintiff testified that her depression and fibromyalgia had gotten worse since the

January 27, 2003 hearing.  (AR at 395).  Specifically, plaintiff stated that the fibromyalgia pain had become more limiting and affected her ability to concentrate and retain information.  (Id.).  Plaintiff testified that she suffered from chronic fatigue and was exhausted even when she had done nothing.  She stated that her joints ached, were stiff, sore and extremely painful, and that the pain could not be eliminated with medication.  (AR at 400).  She testified that the only treatment her doctor had recommended for her fibromyalgia was ibuprofen.  (AR at 401).

With regard to her depression, plaintiff testified that she had become increasingly more hopeless and that she was not responding well to medication, despite the efforts of her current therapist, Dr. Smith.  (AR at 395-96).  She stated that the depression also affected her ability to concentrate and retain information.  (AR at 395).  Plaintiff testified that she would have trouble going to work everyday and explained:

> I can barely get out of bed in the morning and once I do, it's a very slow process of what I do.  If I can get out and take a shower and then after that, I'm exhausted.  I wake-up exhausted and then taking a shower is exhausting and then that starts the whole cycle of being depressed because I've done nothing and I'm exhausted and there's no motivation. There's no, there's nothing.

(AR at 397).  When asked what signs of depression plaintiff had, she replied that she suffered from a feeling of hopelessness and that the ineffectiveness of her medications and lack of improvement in her fibromyalgia contributed to her depression.  (Id.).  Plaintiff testified that she was unable to get a restful night of sleep, even with medication, and that she takes medication for panic attacks.  (Id.).

Plaintiff further testified that she had trouble starting new things and being around new people.  (Id.).  Plaintiff testified that her panic attacks could be triggered without reason, or by being around a lot of people, in a new situation or in a new place.  Plaintiff testified that she did not drive or go to the store very much because of her panic attacks.  She stated that during a panic attack her heart rate increases and she gets the urge to "run away immediately."  (AR at

398).  Plaintiff testified that stress exacerbates her condition and that she gets stressed about the fact that she is not capable of doing anything or of making contributions to the household.  (AR at 398-99).

Plaintiff testified that she can only sit, stand, and lay down for so long without experiencing discomfort.  (AR at 400).  When asked if she could do a "sit-down job" similar to her past relevant work  with her current impairments, plaintiff replied:

> . . . I'm not comfortable.  It's painful.  I mean, sitting here now
> is painful. . . I couldn't do it for hours on end and as far as the
> physical pain goes and then the concentration, the pressure of
> my previous job, extremely high pressure . . . I couldn't even
> imagine functioning and doing that.

(AR at 401).

Plaintiff testified that she lives in a house with her sister, who is bipolar and on disability, and her mother, who is retired, and feels like a burden on her mother and her sister:

> . . . I feel extremely useless as a person and also, in my
> household, I've put a burden on my mother and my sister and
> I've already been independent, always worked, always
> supported myself and I would rather be taking care of my
> mother now.  She's retired [sic] than have to use her money
> from her house to take care of me and my motivation would be
> to go out and earn a living and help to contribute to the house
> if I possibly could and if I could work a half a day somewhere,
> I know that the next two days I would be in bed recovering from
> that half a day.

(AR at 403-04).  Plaintiff testified that she rarely does work around the house and spends most of her day sleeping.  She testified that she watches television occasionally, does some dusting, but spends most of her day "sleeping, watching TV, and going back to bed."  (AR at 405).  Plaintiff testified that she obtained a California drivers license on April 15, 2003, but that she

1    rarely drives an automobile, that it had been several weeks since she had driven and that she

2    had not driven further than six miles on any particular trip that year.  (AR at 405).

3          In the Daily Activities Questionnaire, plaintiff stated that she was capable of limited

4    activities.  (See AR at 95-100).  Plaintiff stated that she spent her days at home on average,

5    and that she had trouble sleeping.  (AR at 95).  Plaintiff testified that she did not require

6    assistance with her personal needs, prepared and cooked her own meals, went grocery

7    shopping every two weeks, sometimes with her mother or sister, and that she was able to do

8    chores, but required help with heavy cleaning, vacuuming, and washing the floors due to

9    fatigue.  (AR at 95-96).  Plaintiff stated that she went out of her home as little as possible, and

10   generally went to the grocery store, pharmacy or to doctor's appointments.  (AR at 97).  She

11   stated that she did not need any help to get out, but sometimes needed help driving.  (Id.).

12         Plaintiff also stated in the questionnaire that she was easily irritated and overwhelmed,

13   and lost her patience easily.  (AR at 98).  She stated that her social activities had changed

14   since her condition began and that she did not visit family often, talked to relatives on the phone

15   several times a month, and her entertainment consisted of television and playing solitaire.  (Id.).

16   Plaintiff stated that she had problems concentrating, was easily distracted, and her memory

17   was impaired.  (AR at 99).  She stated that she could not work due to chronic fatigue,

18   migraines, lack of memory and concentration, panic disorder, fibromyalgia, severe joint and

19   muscle pain and an inability to learn new things.  (Id.).

20         An ALJ is not "required to believe every allegation of disabling pain" or other

21   non-exertional impairment.  See Fair v. Bowen, 885 F.2d 597, 603 (9th Cir.1989).  However,

22   to discredit a claimant's testimony when a medical impairment has been established, the ALJ

23   must provide "specific, cogent reasons for the disbelief."  Morgan v. Comm'r, 169 F.3d 595, 599

24   (9th Cir. 1999) (quoting Lester, 81 F.3d at 834).  The ALJ must "cit[e] the reasons why the

25   [claimant's] testimony is unpersuasive."  Id.

26         In Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007), the Ninth Circuit summarized the

27   Social Security Administration rulings that specify the proper bases for rejecting a claimant's

28   testimony.  See SSR 02-1p; SSR 96-7p.  Factors that an ALJ may consider in weighing a

1  claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between

2  testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to

3  seek treatment or follow a prescribed course of treatment. <u>Orn</u>, 495 F.3d at 635 (<u>citing</u> <u>Fair</u>,

4  885 F.2d at 603 and <u>Thomas</u>, 278 F.3d at 958-59).

5         An ALJ may rely on a plaintiff's conservative treatment regimen to reject a plaintiff's

6  testimony of disabling limitations or disabling pain. <u>Fair</u>, 885 F.2d at 604.  In <u>Fair v. Bowen</u>, the

7  Ninth Circuit affirmed an ALJ's credibility decision where the ALJ stated, among other things,

8  that the claimant received only minimal conservative treatment for his various complaints.  <u>Id.</u>

9  The Ninth Circuit also noted that a claimant could overcome an ALJ's credibility decision by

10 offering a credible explanation for the lack of more serious treatment.  <u>See</u> <u>Fair</u>, 885 F.2d at 604

11 ("While such reasoning may not hold up in all cases (there may be claimants with good reasons

12 for not seeking treatment and credible explanations for their ability to work inside but not

13 outside the home), it is sufficient here, as [the claimant] has not put forward any evidence that

14 reconciles the inconsistency between his words and his actions."); <u>see also</u> 20 C.F.R. §

15 404.1530 (listing acceptable reasons for failure to follow prescribed treatment).

16        Here, the ALJ noted that plaintiff received minimal treatment for her fibromyalgia and that

17 plaintiff offers no explanation of why she did not seek further treatment for her fibromyalgia.

18 The ALJ also noted that plaintiff was under "minimal to nonexistent care for her physical

19 complaints" and that plaintiff had not been seen by the County clinic, where she was seen for

20 her physical complaints, in nine months.  (AR at 247).  But, plaintiff testified at the hearing that

21 she had gotten a blood pressure prescription that lasted for one year, and was scheduled to

22 go back to the doctor the next month.  (AR at 401).

23        Defendant also argues that plaintiff offers no explanation of why she did not seek further

24 treatment for her depression.  The ALJ notes that plaintiff's mental health treatment was

25 minimal and that she was only seen once every six weeks.  (AR at 248).  The ALJ noted that

26 plaintiff was not in a structured program, had never been hospitalized due to her mental health,

27 and there are no medical records to indicate she ever was in regular therapy beyond her 30

28 minute sessions with Dr. Smith once every six weeks which "consisted only of talk and

prescription of new medications".  (See AR at 248).  Notwithstanding this, however, this is not a case in which the claimant never sought treatment or disregarded or refused to follow her doctor's advice.  Cf. Fair, 885 F.2d at 604.  Here, plaintiff was in therapy on a regular basis, even if every six weeks, and there is no indication that plaintiff failed to follow the prescribed course of treatment.

The ALJ also cites to inconsistencies in plaintiff's testimony regarding her daily activities.  In evaluating a claimant's credibility, an ALJ must consider the factors set forth in SSR 95-5, including a claimant's daily activities and inconsistencies in a plaintiff's testimony or inconsistencies in a plaintiff's testimony and conduct.  Here, the ALJ found that plaintiff was "not entirely forthcoming regarding her activities of daily living."  (AR at 248).  The ALJ noted that plaintiff "denied any real productive work around the house and alleged that she does nothing but stay in bed and watch television" yet, when questioned by the ALJ at the hearing, plaintiff admitted to still driving and obtaining a California Drivers License in April 2003, by going to the Department of Motor Vehicles.  (AR at 248-49).  This minor inconsistency does not constitute a sufficient basis upon which to reject plaintiff's testimony.

It is unclear from the ALJ's decision whether the ALJ rejected plaintiff's testimony because the objective medical evidence did not fully support plaintiff's subjective complaints.  Once a claimant produces medical evidence of an underlying impairment, a claimant's testimony as to subjective symptoms may not be discredited merely because they are unsupported by objective evidence.  Lester, 81 F.3d at 834; Reddick 157 F.3d 722.  Here, the ALJ found that plaintiff had "a questionably severe impairment in the musculoskeletal system and a severe mental impairment."  (AR at 250).  Accordingly, the ALJ cannot discredit plaintiff's complaints merely because they are unsupported by objective evidence.  The Ninth Circuit has recognized the "highly subjective and idiosyncratic nature of pain and other such symptoms," such that "[t]he amount of pain caused by a given physical impairment can vary greatly from individual to individual."  Smolen, 80 F.3d at 1282.

Based on the foregoing, the Court finds that the ALJ did not provide specific and legitimate reasons for rejecting plaintiff's credibility.

**G.**    <u>Lay Witness Testimony of Susan Hart, Plaintiff's Sister</u>

Finally, plaintiff argues that the ALJ failed to provide clear and convincing reasons for discrediting the testimony of Susan Hart, plaintiff's sister and, therefore, improperly disregarded her testimony. (Joint Stipulation at 39). Defendant argues that the ALJ gave valid reasons for discrediting the testimony of Ms. Hart, in light of plaintiff's financial dependance on her. (Joint Stipulation at 42).

At the September 8, 2005 hearing, Ms. Hart testified that plaintiff had lived with her for three years and that she had the opportunity to observe her during the day. (AR at 407, 408). She testified that plaintiff was depressed and suffered from panic attacks and anxiety attacks when called upon for anything, such as attending a family gathering. (Id.). Ms. Hart testified that plaintiff spent quite a bit of time in bed, cried a lot, seemed inconsolable, and that it was difficult to get her to eat. (AR at 407-08). She testified that plaintiff spent "quite a bit of the day" in this state and that although plaintiff missed many meals, she tried not to let plaintiff go more than a day without eating. (AR at 409). Ms. Hart testified that plaintiff was in such a state every day. (Id.).

Ms. Hart described plaintiff's panic attacks and stated that plaintiff got very tense, nervous and shaky and would have to remove herself from any situation where she was around people other than her mother and sister, such as the grocery store or a family gathering. (AR at 408). She testified that it could take hours for plaintiff to get back to a state that appeared normal. (AR at 408-09).

With regard to plaintiff's fibromyalgia, Ms. Hart testified that plaintiff was in pain if she sat for too long, stood for too long, and even when she was laying down. (AR at 410). "It's like she stiffens up a lot and she just doesn't seem capable of doing any household chores." (Id.). Ms. Hart testified that she knows when plaintiff is in pain when "[s]he winces and she wriggles and moves." (Id.).

Ms. Hart testified that she was currently on disability and had been since the year 2000. (AR at 410). She testified that she and her mother contribute to plaintiff's support and that they had been caring for her for three years on a limited income. (Id.). Ms. Hart testified that plaintiff

1     had worked her whole life and that she had been proud of plaintiff's work ethic before plaintiff

2     became ill.  (AR at 409).

3         A social security claimant may provide evidence from other sources to show the severity

4     of his or her impairment and how the impairment affects his or her ability to work.  20 C.F.R.

5     § 404.1513(d).  Other sources include, but are not limited to, nurse-practitioners, physicians'

6     assistants, therapists, educational personnel, social welfare agency personnel, relatives,

7     friends, and clergy.  Id.  An ALJ may reject the testimony of an "other source" by providing

8     reasons germane to that witness.  See Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993);

9     Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).

10         Ms. Hart is properly categorized as an "other source" and the ALJ may consider her

11   opinion regarding the severity of plaintiff's impairment and how it affects her ability to work.  See

12   20 C.F.R. § 404.1513(d).  An ALJ must consider the testimony of a competent lay witness - a

13   person who is in a position to observe a claimant regularly and testifies regarding the claimant's

14   symptoms and ability to work.  Dodrill, 12 F.3d at 919.  However, an ALJ need not meet the

15   impossible burden of mentioning every piece of evidence presented in his or her decision.

16   Howard v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003); Orcutt v. Barnhart, 2005 U.S. Dist.

17   LEXIS 39731, at *25 (C.D. Cal. Sept. 27, 2005).  Silent disregard of competent lay witness

18   testimony is harmless error if the Court can confidently conclude that no reasonable ALJ, when

19   fully crediting the testimony at issue, could reach a different disability determination.  Stout v.

20   Comm'r, 454 F. 3d 1050, 1056 (9th Cir. 2006).

21         Here, the ALJ discussed Ms. Hart's testimony in his January 6, 2006 decision.  (AR at

22   249).  He noted that Ms. Hart had been on disability for five years and "complained that she and

23   her aged mother had to dilute their meager incomes to support [plaintiff]."  (Id.).  The ALJ

24   summarized Ms. Hart's testimony and noted that Ms. Hart "asserted that [plaintiff] is depressed,

25   anxious, panicky, stays in bed, has pain, and will not eat" and "spends much of her time in bed,

26   cries, and is in pain."  (Id.)  The ALJ, however, noted that plaintiff had gained ten pounds since

27   the last hearing and concluded that Ms. Hart's "testimony can be understood in light of usual

28   family

motivations to help a sibling and her motivation to relieve herself from supporting [plaintiff] is obvious." (AR at 249).

Bias is clearly a relevant factor when evaluating a lay witness's testimony.  The ALJ properly cited to plaintiff's financial dependence on Ms. Hart and Ms. Hart's desire to help plaintiff as the basis for discrediting Ms. Hart's testimony.  (See AR at 249).  Thus, the Court finds that the ALJ properly discredited Ms. Hart's testimony.  See Dodrill, 12 F.3d at 919 (an ALJ may reject the testimony of an "other source" by providing reasons germane to that witness).   In addition, even if the ALJ fully credited Ms. Hart's testimony, the Court finds that no reasonable ALJ could have reached a different disability determination based solely on Ms. Hart's testimony.  See Stout, 454 F.3d at 1056.  Thus, the Court finds that even if the ALJ had erred by discrediting Ms. Hart's testimony, any such error is harmless and could not serve as the basis for remand.  See Burch, 400 F.3d at 679 (a decision of the ALJ will not be reversed for errors that are harmless).

**H.    Remand is Required to Remedy Defects in the ALJ's Decision**

The choice of whether to reverse and remand for further administrative proceedings, or to reverse and simply award benefits, is within the discretion of the Court.  McAlister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989).  Remand is appropriate where additional proceedings would remedy defects in the ALJ's decision, and where the record should be developed more fully. Marcia v. Sullivan, 900 F.2d 172, 176 (9th Cir. 1990).

Here, the Court finds it appropriate to remand this case for further proceedings to allow the ALJ to clarify his findings and apply the correct legal standards.  See Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990).  Remand is required so that the ALJ may properly evaluate plaintiff's subjective complaints.  In the event the ALJ finds that plaintiff's subjective complaints are not fully credible, the ALJ must clearly cite to proper reasons in support of such a finding. The ALJ must specifically identify what testimony is credible and what evidence undermines the claimant's complaints.

///

///

1

**ORDER**

2          The Court, therefore, VACATES the decision of the Commissioner of Social Security

3   Administration and REMANDS this action for further administrative proceedings consistent with

4   this Memorandum Opinion and Order.

5          **LET JUDGMENT BE ENTERED ACCORDINGLY.**

6   DATED: March 7, 2008

7                                                                     /s/
                                        _____
                                        JENNIFER T. LUM
8                                       UNITED STATES MAGISTRATE JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28